CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VIRGINIA
FILED
November 23, 2026
Laura A. Austin, Clerk
By: s/ Kelly Anglim
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DAVID TATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:25-cv-00005 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| TIMOTHY R. DEROSHA, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

By the one surviving count in this case,[1] plaintiff David Tate asserts a First Amendment retaliation claim against Officer Timothy R. Derosha, a state trooper of the Commonwealth of Virginia Department of State Police. (2d Am. Compl. ¶¶ 19–30, Dkt. No. 34.) Mr. Tate's claim arises from an altercation which was triggered when Mr. Tate, at the wheel of his own car, gestured with a conspicuously raised middle finger at a police cruiser driven by Officer Derosha while passing by him. This discourteous gesture caused Officer Derosha to make a U-turn and follow Mr. Tate home. Upon their arriving there, the two engaged in a brief argument at the end of Mr. Tate's driveway with Officer Derosha seated in his vehicle on the road. The two exchanged verbal salvos for about a minute and a half, during which time Officer Derosha intimated that there was an outstanding warrant for Mr. Tate's arrest, which was untrue. Then, the matter concluded when Officer Derosha, who had remained within his cruiser for the duration of the dispute, simply drove off.

Pending now before the court is Officer Derosha's motion for summary judgment (Dkt.

[1] On March 30, 2026, the court entered a memorandum opinion and order (Dkt. Nos. 51, 52) granting Officer Derosha's partial motion to dismiss (Dkt. No. 36) and dismissing the one other count of the operative, second amended complaint, which had asserted a Fourth Amendment claim. (Dkt. No. 34).

Nos. 54, 55), which seeks judgment as a matter of law both on the First Amendment claim itself and on Officer Derosha's defense of qualified immunity. For the reasons set forth below, the court will deny the motion in full.

## I. BACKGROUND

The facts below are taken from materials in the summary judgment record and are undisputed except where noted. The record includes a video recording taken by Mr. Tate, which captures the interaction between Mr. Tate and Officer Derosha. (Video, Dkt. No. 55-1.)

### A. The Incident

On May 6, 2024, Mr. Tate drove past Officer Derosha, who was in a police cruiser in the opposite lane. (*Id.*; Tate Dep. at 12:18–13:2, Dkt. No 55-2.) As he passed, Mr. Tate gestured with his middle finger at Officer Derosha, not out of any animus toward Officer Derosha, who Mr. Tate did not know, but more generally out of frustration with and in protest of the State Police. (Video at 0:00–03; Tate Dep. at 13:6–11, 15:1–16:9; Answers to Reqs. For Admis. (RFA) 9, Dkt. No 55-9.) Officer Derosha then made a U-turn and, without activating his lights or siren, followed Mr. Tate, who drove home. (Video at 0:03–31; Tate Dep. at 13:3–4, 19:6–9; Answers to RFAs 10–11.) At some point during his drive home, Mr. Tate turned on his cellphone camera and began recording himself. (*See generally* Video; Tate Dep. at 13:5.) Upon arriving at his home, Mr. Tate parked in his driveway and got out of his car. (Video at 0:03–31; Answers to RFAs 13.) Officer Derosha stopped in the road in front of Mr. Tate's driveway and remained in his cruiser. (*See generally* Video; Tate Dep. at 19:8; Answers to RFAs 13, 16.)

Mr. Tate then walked up to the cruiser with Officer Derosha in it. (Video at 0:31–40.) Mr. Tate asked, "What can I do for you?" as he put his hands on the cruiser and leaned toward it. (*Id*. at 0:40–42.) Officer Derosha replied, "You can get out of my way," to which Mr. Tate responded, "Okay" and asked Officer Derosha why he was in the road in front of his property.

(*Id*. at 0:42–48.) Officer Derosha retorted that Mr. Tate was "stopping [him] right now" and demanded that Mr. Tate "get out of the road." (*Id*. at 0:48–51.)

Here, the conversation becomes a shouting match. Mr. Tate retreated up his driveway, and Officer Derosha, from his cruiser, inquired after him, "What's your problem?" and Mr. Tate countered, "What's your problem?" (*Id*. at 0:51–53.) Officer Derosha broke the evident stalemate by replying, "I didn't drive by and flip you off," to which Mr. Tate retorted, "I have the right to flip you off." (*Id*. at 0:53–58.) Officer Derosha then began to respond, saying that he had "the right to . . . ", but Mr. Tate interrupted him, saying, "No, you don't have the right to bring me up on your machine for nothing, you have to have probable cause." (*Id*. at 0:58–1:04.) Officer Derosha suggested that that was not accurate, but Mr. Tate reasserted his position. (*Id*. at 1:04–18.)

After this challenge by Mr. Tate, Officer Derosha stated, "Oh! You're wanted," implying that there was an outstanding warrant for Mr. Tate's arrest, a suggestion which Mr. Tate denied. (Video at 1:18–23; Tate Dep. at 21:1–6.) The two both asked each other, "Are you done?" (Video at 1:23–29), and Officer Derosha read off Mr. Tate's full name from somewhere, then said, "Let me check this warrant here." (*Id*. at 1:29–32.) Mr. Tate again rebuffed the idea that a warrant for his arrest existed, but Officer Derosha once more suggested that it did, after which Mr. Tate asked what it was for. (Video at 1:32–38; Tate Dep. at 19:23–25.) Officer Derosha replied that Mr. Tate "would find out." (Video at 1:38–39; Tate Dep. at 19:23–25.) In fact, no warrant for Mr. Tate's arrest existed. (Tate Dep. at 7:7–14.) According to Mr. Tate, he felt intimidated and believed he was about to be arrested (*id*. at 20:2–13, 21:1–6), so he began walking away from the police cruiser and announced that he was going to move and park his car (Video at 1:39–44; Tate Dep. at 20:1–3). This feeling of intimidation and fear of arrest caused

Mr. Tate to feel restrained in what he could do. (Tate Dep. at 19:21–20:13.) But, as Mr. Tate went to get into his vehicle, Officer Derosha shouted "hey" at him then drove off, and Mr. Tate bid him farewell by offering one final expletive at the departing cruiser. (Video at 1:44–49.)

**B. The Aftermath**

As a result of the altercation, Mr. Tate asserts that he has experienced fear, nervousness, and anxiety (Tate Dep. at 7:15–8:24, 19:21–20:13; Answers to RFAs 29–30), leading him to seek treatment to help him combat the difficult side effects that have come from them. (Tate Dep. at 9:19–11:20; Answers to RFAs 30–35.) These damages are contested by Officer Derosha who counters with evidence of pre-existing conditions. (*See generally* Tate Medical Files, Dkt. Nos. 55-5, 55-6, 55-7, 55-8, 55-12.)

## II. ANALYSIS

**A. The Summary Judgment Standard**

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court "may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant." *Quinn v. Zercle*, 111 F.4th 281, 290 (4th Cir. 2024) (quotation marks omitted). Instead, the court must "view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.*

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (omission in original) (citing Fed R. Civ. P. 56(e)). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50).

**B. A Reasonable Jury Could Find that Officer Derosha Took Some Action that Adversely Affected Mr. Tate's First Amendment Rights.**

In support of a First Amendment retaliation claim, the second amended complaint asserts that: (1) Mr. Tate engaged in protected First Amendment activity when he gestured at Officer Derosha with his middle finger (2d Am. Compl. ¶ 24); (2) Officer Derosha's following Mr. Tate home, stopping at the end of his driveway, and falsely informing Mr. Tate that he had an outstanding warrant adversely affected Mr. Tate's First Amendment rights (*id.* ¶¶ 21–23, 25); and (3) there was a causal relationship between Mr. Tate's actions and Officer Derosha's actions (*id.* ¶¶ 24, 27).

To succeed on this claim, a plaintiff must demonstrate that: (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected the plaintiff's First Amendment rights, and (3) there was a causal relationship between the protected activity and the defendant's conduct. *Snoeyenbos v. Curtis*, 60 F.4th 723, 730 (4th Cir. 2023) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)). Officer Derosha argues only that Mr. "Tate's claim fails because he cannot establish that [Officer] Derosha 'took some action that adversely affected [his] First Amendment rights.'" (Br. in Supp. 12 (quoting *Snoeyenbos*, 60 F.4th at 730).) For summary judgment purposes only, he does not contest the first or third elements of the claim.

Thus, the court looks only to whether Officer Derosha took some action that adversely affected Mr. Tate's First Amendment rights.

The Fourth Circuit has held that threats of imminent state punishment can constitute retaliatory actions under the First Amendment. In *Suarez Corporation Industries v. McGraw*, 202 F.3d 676 (4th Cir. 2000), the Fourth Circuit considered several statements made by the West Virginia Attorney General and a deputy attorney general which the plaintiff alleged to be retaliatory. *Id.* at 688–91. The statements included "alleged defamatory statements to the media[, to Dun & Bradstreet, a business analytics and insights provider,] and to other attorneys general," as well as truthful statements to the Better Business Bureau. *Id*. at 688. The court noted that "these alleged retaliatory acts are in the nature of speech" and that this implied a clash between the plaintiff's "right to free speech versus [the defendants'] First Amendment speech rights, as well as their duty" as law enforcement officials. *Id.* at 688–89. The court then held that "the appropriate inquiry to determine whether [the defendants] adversely affected [the plaintiff's] First amendment speech rights" was whether the speech of the defendants at issue "was threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." *Id*. at 689. Finding that none of the statements made by the defendants constituted a "direct or implied threat or coercive language," or intimated that the defendants would "punish, sanction, or take adverse action," the court found the statements not to be retaliatory. *Id*. at 689–91.

The Fourth Circuit reaffirmed that a court properly inquires as to threats of imminent state punishment six years later in *Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006), when it considered whether statements made by the governor of West Virginia were retaliatory under the First Amendment. There, the governor stated that, if the plaintiff continued his campaign

against a proposed amendment to the state constitution, that "his record is open" and he "should expect tougher scrutiny of his business affairs," while noting that the plaintiff's company "has had numerous run-ins with state environmental regulators." *Id*. at 526. Citing *Suarez*, the court considered "whether the remarks threatened imminent adverse regulatory action." *Id*. at 528–29. The court suggested that the governor's remark that the plaintiff should expect "tougher scrutiny" implied that the plaintiff "would receive more scrutiny . . . than other, similarly situated companies" and that this would be "harsher, or at least disparate, treatment." *Id*. at 530. The court then concluded that the remarks were "reasonably construed as threats" which "constitute[d] an intimation of imminent adverse regulatory action and satisfies [the standard set forth by] *Suarez*." *Id*.

However, the Fourth Circuit has cautioned that "not all retaliatory conduct tends to chill First Amendment activity," and so, "a plaintiff must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to [his] exercise of First Amendment rights." *Snoeyenbos*, 60 F.4th at 731 (quotation marks and alteration omitted) (quoting *Constantine*, 411 F.3d at 500 (citing *ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993))); *see also Blankenship*, 471 F.3d at 530–33. To determine whether something is more than a *de minimis* inconvenience, courts in the Fourth Circuit ask whether the retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Snoeyenbos*, at 731 (citing *Constantine*, 411 F.3d at 500). In examining this question, courts look to "the circumstances presented in the particular case." *Balt. Sun Co. v. Ehrlich*, 427 F.3d 410, 416 (4th Cir. 2006) (citing *Constantine*, 411 F.3d at 500; *Wicomico County*, 999 F.2d at 786)). The Fourth Circuit has also noted that, "[w]hile the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to

chill First Amendment activity, it is not dispositive." *Constantine*, 411 F.3d at 500.

The Supreme Court has noted that the threat of arrest, when made by police, has the capacity to chill speech. In *Nieves v. Bartlett*, 587 U.S. 391 (2019), the court held that if police officers are guaranteed qualified immunity in situations where they threaten arrest and have probable cause to do so, but ultimately do not make an arrest, it "could pose 'a risk that some police officers m[ight] exploit the arrest power as a means of suppressing speech.'" *Nieves*, 587 U.S. at 406 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018) (suggesting the same risk without making an explicit holding connected to it)).

And closer to the issues in this case, the Fourth Circuit has also concluded that the threat of arrest is likely to deter a person of ordinary firmness from exercising their First Amendment rights. In *Nazario v. Gutierrez* (*Nazario I*), No. 2:21-cv-169, 2022 WL 3213538, at *18 (E.D. Va. Aug. 9, 2022), Mr. Nazario, who was complaining about his treatment by police during a traffic stop, was warned that he could either continue to complain and be arrested for his actions during the stop or be silent about what he viewed to be police misconduct and let it go. *Id*. at *1–2, 17–19. Considering these facts in the context of a First Amendment retaliation claim, the court found that "a similarly situated person would have his speech chilled by a threatened arrest." *Id*. at *18. In the end, however, the court granted summary judgment in the police officers' favor as to Mr. Nazario's First Amendment claim, finding the officers were entitled to qualified immunity because they had probable cause to arrest Mr. Nazario for his actions during the stop.[2] *Id*. at *19 (citing *Hartman v. Moore*, 547 U.S. 250, 261 (2006) (requiring the absence of probable cause in retaliatory prosecution claims because where probable cause exists to suspect underlying criminal actions, there is a suggestion "that prosecution would have occurred

[2] Officer Derosha is not claiming to have probable cause to arrest Mr. Tate.

even without a retaliatory motive"); *Nieves*, 587 U.S. at 408–09 (holding that the same logic applies to retaliatory arrest claims)).

The Fourth Circuit agreed with the district court, holding that "the threat of an arrest is likely to deter a person of ordinary firmness from the exercise of their First Amendment rights." *Nazario v. Gutierrez* (*Nazario II*), 103 F.4th 213, 237 (4th Cir. 2024) (quotation marks and alteration omitted). Because there was probable cause for the Nazario's arrest, however, the Fourth Circuit held that there was no causation for retaliation, and thus no constitutional violation. *Id*.

A case from another district, *McCormick v. City of Lawrence*, 253 F. Supp. 2d 1172 (D. Kan. 2003), is particularly analogous and, therefore, informative. There, Mr. McCormick and multiple police officers got into several arguments and altercations over the course of four months. *Id*. at 1178–83. In one interaction, Mr. McCormick drove home to find an officer parked in a police cruiser on the street in front of his driveway and then honked at the officer to move. *Id*. at 1178. When the officer did move, Mr. McCormick parked and went to ask why the officer was parked in front of his driveway. *Id*. When an argument ensued between him and the officer, and Mr. McCormick pronounced the officer to be a "cognitively impotent pig," the officer suggested that Mr. McCormick "better watch it or this pig is going to take you to jail." *Id*. at 1178–79. In the end, the officer left without arresting Mr. McCormick. *Id*. at 1179. A week later, Mr. McCormick got into argument with a different officer in which he "flipped the bird" to the officer "mostly to 'test' his First Amendment rights." *Id*. After he was then followed by the officer, the two got into an argument, and the officer "stated that he could 'arrest' Mr. McCormick." *Id*. Ultimately, the officer there also did not arrest Mr. McCormick. *Id*. at 1179–80. Two days later, Mr. McCormick was again threatened with arrest but not

arrested while protesting a traffic stop he witnessed. *Id*. at 1180. Considering these threats of arrest, the court held that "the threat of arrest by a police officer is exactly the sort of act that would deter a person of ordinary firmness from exercising his or her First Amendment right to orally challenge that officer." *Id*. at 1196.

Numerous other courts have come to this conclusion as well. *See*, *e.g.*, *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023) (holding that "[t]he threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights"); *Daniels v. Dixon*, 8:21-cv-223, 2021 WL 4468940, at *2–3, 11–12 (C.D. Cal. Aug. 13, 2021) (holding that, where a police officer stated that a person needed to provide identification or risk being arrested, the threat of arrest was "sufficient to chill a person of ordinary firmness"); *Johnson v. Cnty. of San Bernadino*, 5:18-cv-2523, 2020 WL 5224350, at *17 (C.D. Cal. June 24, 2020) (holding that "even a warning or threat of arrest . . . plainly meets th[e] standard" of chilling a person of ordinary firmness); *Kimberlin v. Nat'l Bloggers Club*, 8:13-cv-3059, 2015 WL 1242763, *16 (D. Md. March 17, 2015) (holding that a prosecutor's "galvanizing law enforcement to open criminal investigations . . . created a realistic threat of arrest" that "could reasonably be expected to chill the exercise of one's First Amendment rights"); *Perez-Morciglio v. Las Vegas Metro. Police Dept.*, 820 F. Supp. 2d 1111, 1119 (D. Nev. 2011) (holding that "[a] reasonable jury could find that a person of ordinary firmness would be deterred from future First Amendment activities by," among other things, an officer's "threatening arrest").

The parties do not dispute what Officer Derosha did and said. After Mr. Tate flipped him off, Officer Derosha made a U-turn, followed Mr. Tate home, and stopped in the road in front of Mr. Tate's driveway. (Br. in Supp. 4; Opp'n 5; Video at 0:03–31.) During the verbal altercation

that ensued, Officer Derosha read Mr. Tate's full name from somewhere and repeatedly stated falsely that there was an outstanding warrant for Mr. Tate's arrest. (Video at 1:18–23, 1:29–38.) At the close of the interaction, Officer Derosha stated that Mr. Tate "would find out" what the warrant was for (Video at 1:38–39) and then drove away (Video at 1:44–49). Also, for purposes of summary judgment, the court accepts that Mr. Tate announced that he was going to move and park his car (Video at 1:39–44; Tate Dep. at 20:1–3) because he felt intimidated and believed he was about to be arrested (Tate Dep. at 20:2–13, 21:1–6).

Although the parties do not dispute what was done and what was said, there *is* a dispute about the meaning and implications of Officer Derosha's words and actions. In his brief in support of the motion, Officer Derosha acknowledges that he referred to a warrant. (Br. in Supp. 5.) In his opposition, Mr. Tate suggests that Officer Derosha did more than refer to a warrant. Mr. Tate argues that Officer Derosha's statements "mean[t] that [Mr. Tate] was about to be arrested and jailed" by Officer Derosha. (Opp'n 4.) Officer Derosha responds that his words "do[ ] not mean that [Mr. Tate] was threatened with arrest or immediate punishment, and [Mr. Tate] does not create a triable issue over whether he was." (Reply 5, Dkt. No. 57.) Officer Derosha goes on to say that Mr. "Tate's biased 'speculation and conjecture' does not support a reasonable 'inference' that he was threatened with arrest or immediate punishment." (*Id.*)

The first question the court must answer is whether Officer Derosha has shown as a matter of law that his actions were not "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." *Blankenship*, 471 F.3d at 528 (quoting *Suarez*, 202 F.3d at 689). However, there is a dispute as to what was meant by Officer Derosha's words and actions. Under the circumstances and in a light most favorable to Mr. Tate, a reasonable jury could find that Officer Derosha threatened Mr. Tate with

imminent punishment in the form of Mr. Tate's arrest. If a jury so found, it also could reasonably conclude that Officer Derosha's words adversely affected Mr. Tate's First Amendment rights.

This genuine dispute of material fact extends to the next question the court would need to ask as well, namely the question of whether Officer Derosha's conduct would deter "a person of ordinary firmness." With respect to this question, the subjective response of Mr. Tate "provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine*, 411 F.3d at 500 (quotation marks omitted); *Martin v. Duffy*, 858 F.3d 239 (4th Cir. 2017) (noting that the subjective response of the plaintiff "is not dispositive of the question of whether such action would likely deter a person of ordinary firmness"). As to Mr. Tate's subjective response, the record suggests that Officer Derosha's repeated insistence about the warrant did have a chilling effect on Mr. Tate's conduct. While it is evident that Mr. Tate initially responded to Officer Derosha with a degree of confidence and argumentativeness (Video at 0:31–1:18), as Officer Derosha continued to reaffirm that a warrant was out for Mr. Tate's arrest (Video at 1:18–39), Mr. Tate was led to believe that he might be about to be arrested and went to move his car to prepare for that eventuality. (Video at 1:39–49; Tate Dep. at 20:1–13, 21:1–6.) Mr. Tate's subjective response, while not dispositive, is evidence that can be considered by a jury. *Martin*, 858 F.3d at 250.

In sum, to prevail on his motion for summary judgment, Officer Derosha must show as a matter of law that "a person of ordinary firmness" would not be deterred from exercising his First Amendment rights if a police officer made a U-turn to follow him, stopped in front of the driveway of his house, repeatedly told him that there was an outstanding warrant for his arrest, then said that the person "would find out," apparently with respect to the warrant, and drove off

without explaining more. Because a reasonable jury could find that a person of ordinary firmness would be deterred by such conduct, the court must deny the motion for summary judgment unless Officer Derosha is shielded by the defense of qualified immunity. Accordingly, the court proceeds to that question.

**C. Because There Are Disputes of Fact, Officer Derosha Is Not Entitled to Qualified Immunity.**

Officer Derosha next argues that, even if Mr. Tate has asserted a successful First Amendment retaliation claim, he is entitled to summary judgment because he is shielded by qualified immunity. (Br. in Supp. 12–13; Reply 11–12.) Here, having found that there are genuine factual disputes as to whether Officer Derosha threatened Mr. Tate with arrest and whether a person of ordinary firmness would be deterred from exercising his First Amendment rights, the court must reach the same outcome that it did with respect to the underlying First Amendment claim. As the court more fully explains below, because the qualified immunity analysis considers whether a "'reasonable official would have understood that what he is doing violates' the law," and there is a genuine factual dispute as to whether Officer Derosha threatened arrest or not and whether a person of ordinary firmness would be deterred, those disputes are material to the question of qualified immunity. *Brown v. Elliott*, 876 F.3d 637, 642 (4th Cir. 2017) (quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The qualified immunity doctrine provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from 'bad guesses in gray areas' and

ensures that they are liable only 'for transgressing bright[-]lines.'" *Phillips v. Peddle*, 7 F. App'x 175, 178 (4th Cir. 2001) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

To evaluate qualified immunity claims, courts engage in a two-pronged inquiry: "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right" and "[t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (cleaned up) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). "Accordingly, a court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established." *Nazario II*, 103 F.4th at 230.

As for the first prong, the court has already held that a reasonable jury could find that Officer Derosha violated Mr. Tate's First Amendment rights. Officer Derosha is therefore entitled to qualified immunity only if Mr. Tate's right was not clearly established.

"In determining whether a right is clearly established, the court looks first to cases of controlling authority," and where "there are no such decisions from courts of controlling authority, the court may also look to a consensus of cases of persuasive authority from other jurisdictions." *Acord v. Stilley*, 749 F. Supp. 3d 635, 643 (W.D. Va. 2024) (quotation marks omitted) (citing *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538–39 (4th Cir. 2017)). In *Acord*, this court explained further that:

> it is important to frame the right at the correct level of generality. To deny qualified immunity, the law must be "clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation he confronted.'" *Mullenix v. Luna*, 577 U.S. 7, 12–13 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *id.* at 12, (explaining that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition"). While there need not be a case "directly on point for a right to be

> clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

*Id*.

As the court set forth above, it is well established in the Fourth Circuit that threats of imminent state punishment can constitute retaliatory action. Furthermore, in addition to the controlling comment from the Supreme Court in *Nieves*, [3] there is also extensive persuasive case law that stands for the proposition that an officer's threat of arrest chills free speech. *See Nieves*, 587 U.S. at 406; *Turner*, 65 F.4th at 580; *Nazario I*, 2022 WL 3213538, at *18; *Daniels*, 2021 WL 4468940, at *2–3, 11–12; *Johnson*, 2020 WL 5224350, at *17; *Kimberlin*, 2015 WL 1242763, *16; *Perez-Morciglio*, 820 F. Supp. 2d 1111, 1119. And the case law, although from a different district court, even addresses an almost perfectly analogous situation, as the court in *McCormick* addressed a situation where Mr. McCormick "flipped the bird" at an officer, was followed by the officer, the two got into an argument where the officer threatened Mr. McCormick with arrest, and ultimately, Mr. McCormick was not arrested. *McCormick*, 253 F. Supp. 2d at 1179–80. On those facts, the court held that such a threat "would deter a person of ordinary firmness from exercising his or her First Amendment right." *Id*. at 1196.

Here, the court has determined that, viewing Officer Derosha's words and actions in a light most favorable to Mr. Tate and interpreting them in his favor, a reasonable jury could find that Officer Derosha threatened to arrest Mr. Tate and that a person of ordinary firmness would be deterred in the exercise of his First Amendment rights. Furthermore, it is clearly established

[3] It bears noting that the Fourth Circuit's decision in *Nazario II*, which addresses this issue and is controlling authority as to this court, is, however, not controlling authority on this issue *with respect to the facts of this case*, because it was entered on May 31, 2024, 25 days after the events in this case. *See Nazario II*, 103 F.4th 213. Therefore, *Nazario II* could not have been a basis for Officer Derosha's understanding of what was prohibited in this situation.

that a police officer cannot make such a threat in response to protected speech. Therefore, the court must conclude that genuine disputes of material fact preclude application of qualified immunity.

## III. CONCLUSION

For the foregoing reasons, Officer Derosha's motion for summary judgment will be denied. The court will enter an order consistent with this opinion.

Entered: November 23, 2026.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
Chief United States District Judge